**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Reginald COCHRAN, William Ronald Watson, and William Robert Bland,
Defendants-Appellants.**

No. 73–1820.

United States Court of Appeals,
Fifth Circuit.

Aug. 23, 1974.

Rehearing Denied Sept. 25, 1974.

Rehearing and Rehearing En Banc
Denied Oct. 7, 1974.

Nathaniel G. W. Pieper, Tampa, Fla. (Court-appointed), for Reginald Cochran.

Henry Gonzalez, Tampa, Fla., for William Ronald Watson.

Arnold Levine, Tampa, Fla., for William Robert Bland.

John L. Briggs, U. S. Atty., Jacksonville, Fla., Claude H. Tison, Jr., Asst. U. S. Atty., Tampa, Fla., for plaintiff-appellee.

Before DYER and MORGAN, Circuit Judges, and KRAFT, District Judge.

DYER, Circuit Judge:

A flim-flam is a confidence game designed to fleece a victim through some fraud or trickery, in this case by a pretended sale of stolen gems at a bargain price. By a three-count indictment Reginald Cochran, Stanley Cochran (son of Reginald), Parker (an associate of the Cochrans), Bland (a Tampa police official), and Watson (a Tampa used-car lot owner) were charged with violations of 18 U.S.C.A. §§ 2314, 2 and 371. Count one charged the defendants with conspiring to transport from Georgia to Florida stolen gems for use in a flim-

flam and transportation of the gems and the monies obtained from the flim-flam back to Georgia. Counts two and three charged the substantive offenses of interstate transportation from Valdosta, Georgia to Tampa, Florida and vice versa. Reginald Cochran was found guilty on all counts. Bland and Watson were found guilty on counts one and three.[1] In their appeal the defendants assert various errors, including prosecutorial misconduct, error in the court's refusal to sever their trials, error in evidentiary and procedural rulings, and, as to Watson, ineffective assistance of counsel requiring a mistrial. We affirm.

Sufficiency of the evidence to support the verdicts is not contested by any of the defendants, so it would be inutile to detail the evidence presented in this lengthy trial.[2] In abbreviated form the historical facts undergirding the convictions established that Stanley Cochran knew burglars who had robbed a jewel merchant in Georgia of about $80,000 in gems. Stanley introduced the burglars to his father, Reginald, who purchased a substantial quantity of the stolen jewelry.[3] After acquiring the gems, Reginald contacted Stanley, Watson and Parker to set up the flim-flam operation in Tampa. Watson then introduced Parker to a Tampa confidence man named Perdue. On April 1, 1971, Reginald and Stanley drove from Valdosta to Tampa, bringing with them an assortment of gems, including the stones Reginald had purchased from the burglars in Georgia.

Reginald had also invited Dyal, an acquaintance, to participate in the flim-flam. Reginald told Dyal that Watson was in on the operation and that the "blow-off" man would be a policeman who had been on the Tampa police vice squad. Unknown to Reginald, Dyal was an informer for the FBI who communicated his information to a special agent.

On April 1, 1971, Parker, Watson and the two Cochrans met at Watson's used-car lot in Tampa to discuss the operation. After formulating their plans, Parker left with Perdue to meet the intended victim, Letizia, who was chosen because he was thought to have been skating on the penumbras of the law. As a result of his conversations with Letizia, Parker reported back to Watson and the Cochrans that Letizia had agreed to look at the stolen jewels and that he should be "good" for fifteen to twenty thousand dollars. Watson and Reginald assured Parker that they had a "blow-off" man available—that is, a person who, at the right moment, appears and announces that he is a policeman and ostensibly arrests the confederate carrying the jewels so that another confederate can persuade the victim to flee to avoid arrest. Thus, in a successful flim-flam, even if the victim suspects that he has been swindled, he would not report the incident, since to do so would be to admit his intention to buy stolen property.

On April 2, 1971, Parker and Perdue again met Letizia and explained that they knew a person who had a quantity of stolen gems which could quickly be resold at a large profit, but that they did not have enough money between the two of them to make the purchase. They offered to cut Letizia in for fifty percent of the profits if he would help finance the purchase. The proposal apparently appealed to Letizia, who went with Parker and Perdue to a motel room that Parker had previously rented. At the motel, the three were greeted by Stanley, playing the part of the thief, who after some "persuasion" let them into the room and then displayed the

---

1. Stanley Cochran entered a plea after the trial started. The indictment was dismissed as to Parker, and he testified for the Government.

2. The trial lasted five weeks. The record contains over 5200 pages. Three hundred and sixty-eight documents were introduced.

3. For convenience the Cochrans will be identified by their first names, Stanley and Reginald.

merchandise. To make the flim-flam look genuine, Parker expressed doubt as to the gems' value and suggested that they have an appraiser whom he knew examine the stones. Stanley "agreed," so Parker went outside and called Watson at the car lot, instructing him to send Reginald over to act as an appraiser. Parker also told Watson that he would need the "front money" to induce Letizia to go through with the deal. A few minutes later, and unbeknown to Letizia, Watson brought Parker $1,200 in $100 bills. In addition, Perdue had $200 to use as front money.

At the appointed time Reginald appeared at the motel room with scales, measuring devices, and other jeweler's equipment. He was introduced to Stanley, the "thief," and Letizia, the victim, and examined the stones that Stanley had laid out. Upon completion of his appraisal, Reginald, accompanied by Parker, Perdue and Letizia, went into the bathroom, out of the presence of Stanley, where Reginald said he would pay $22,500 for the gems. Reginald then left, and Parker, Perdue and Letizia finally settled with Stanley on a price of $15,000 for the gems. Parker left with Letizia to get Letizia's money, while Perdue stayed with Stanley, ostensibly to ensure that Stanley made no substitutes of the gems he had shown.

At this point, Letizia withdrew $14,000 from his savings account. Parker then telephoned Watson at the car lot, who told him to proceed with Letizia to the Holiday Inn motel, where the transfer was to be made. Watson assured Parker that the "blow-off" man was ready. Stanley and Perdue went to the Holiday Inn, where Stanley saw appellant Bland, the "blow-off" man, seated in his green Chevrolet, an unmarked official police car, assigned on a permanent basis to Bland as a Major in the police department. Upon the arrival of Parker and Letizia, they all adjourned to the men's rest room. Stanley gave Parker the jewels, and Letizia gave Stanley $13,600 to add to the $1,400 in front money put up by Parker and Perdue.

Stanley left with the money, cautioning the others to wait a few minutes before leaving. Upon his departure from the motel Stanley again saw Bland seated in his car.

A few minutes later the others left the motel, with Parker carrying the jewels. By prearrangement Parker was to be "arrested" while Perdue was to keep Letizia inside so he could not observe the "arrest" too well. As Parker stepped outside, he saw Watson pointing toward Bland's car. Bland immediately drove up to Parker, got out and "arrested" him, taking the jewels from Parker and directing Parker to get into the car. Parker looked back, saw Letizia observing the action and heard him say, "Goddam, another flim-flam." Bland then drove the "arrested" Parker to Watson's lot, where Parker rejoined Watson and the Cochrans. Parker gave the jewels back to Cochran, and after the front money was deducted, the $13,600 was split six ways, with Watson keeping the shares of Bland and Perdue.

Later in the day, Perdue told Watson, Parker and the Cochrans that Letizia had gotten an auto license number. It developed that after seeing the "arrest" Letizia had rushed back into the motel, grabbed a pen from the hand of a guest at the registration desk, tore off a piece of paper, and had written a number on it. While waiting for the police, Letizia told the desk clerk and the bartender that he had been robbed of $13,000. Upon the arrival of a police officer, Letizia gave him the paper with a tag number written on it, which was later found to correspond with the license number on Bland's official car. Letizia also gave the officer a description of the car which matched the unmarked police unit permanently assigned to Major Bland.

That night Reginald drove back to Valdosta with the jewels and his share of the money. Stanley flew to Atlanta, Georgia with his share, and the next day Parker drove to Valdosta with his share.

At trial, neither Reginald nor Watson testified. Officer Bland did take the

stand. In essence Watson and Bland denied any participation in the flim-flam and presented an alibi defense.

## CHARGE OF PROSECUTORIAL MISCONDUCT

By collating what they define as a series of unfair tactics employed by the prosecutor, the defendants paint prosecutorial misconduct with a broad brush. First, they complain about the prosecutor's allegedly improper use of Jencks Act statements.[4] On several occasions, after extensive use on cross-examination by defense counsel of prior statements and interviews, the Government then offered the statements into evidence, but the district court excluded them. The defense argues that the Government's offer in itself constituted improper conduct, since it was done in an attempt to impugn the integrity of defense counsel by suggesting that the defense was attempting to hide certain facts from the jury. Not so, says the Government.

Almost without exception, defense counsels' attempts to impeach the Government's witnesses focused not on any prior inconsistent statement of the witnesses but on the absence from the prior statements of some detail that had been included in the trial testimony. For example, defense counsel would direct the witness' attention to some portion of testimony given by him on direct examination, then show the prior statement to the witness and direct him to examine it and state whether the testimonial statement could be found in it. After such attempted impeachment by the defense, the Government offered the full statements of its witnesses for the purpose of enabling the jury to understand the context in which the asserted impeaching omissions occurred. None were admitted.

We are unmoved by the arguments of either the Government or the defendants. Beaudine v. United States, 5 Cir. 1969, 414 F.2d 397, 403, relied on by the defendants, lends them no support.

There we adopted the well-reasoned opinion of the First Circuit in Pallotta v. United States, 1 Cir. 1968, 404 F.2d 1035, 1037, in which the court said: "If the statements are used in cross-examination, the jury should be informed of the source of the questions and the statutory authority governing the use of such statements." We sought to avoid either the prejudice to a defendant that might result from the jury's knowledge of a Government witness' prior statements that defendants were unable to use for impeachment, and the prejudice to the Government that might result, if prior statements were used, from the inference of concealment that might follow if their source were not disclosed.

■■■ While we do not disagree with the Government that the offers of the statements were made in good faith, assuming them to be admissible under the doctrine of testimonial completeness ("which permits the introduction into evidence of an entire statement when only a portion of it has been used by an opponent," thus giving the trier of fact a complete understanding of the tenor and effect of the statement in its proper context, United States v. Smith, 6 Cir. 1964, 328 F.2d 848, 850, cert. denied, 1964, 379 U.S. 936, 85 S.Ct. 336, 13 L. Ed.2d 346; United States v. Lev, 2 Cir. 1960, 276 F.2d 605, 608, cert. denied, 1960, 363 U.S. 812, 80 S.Ct. 1248, 4 L. Ed.2d 1153; Short v. United States, 9 Cir. 1959, 271 F.2d 73, 78, cert. denied, 1960, 361 U.S. 948, 80 S.Ct. 402, 4 L. Ed.2d 381), we agree with the court below that in the circumstances here presented the statements should have been excluded. The testimonial completeness doctrine has never been expanded beyond showing an inconsistency between two positive statements about the same thing. While an asserted inconsistency in the form of a prior omission is a much more ambiguous proposition, it can, in most instances, be adequately dealt with by interrogation of the witness rather than by an introduction of the earlier statement. The trial

4. 18 U.S.C.A. § 3500.

judge must exercise his sound discretion in the circumstances as they develop at trial so that the cross-examiner may not unfairly be credited with impeaching a witness without having ever demonstrated any inconsistency to the jury. Having said this, it is apparent that the prosecutor was guilty of no prejudicial misconduct in offering the statements to counter the defendant's attempted impeachment by silence in prior statements, even though under the circumstances *sub judice* the lower court properly ruled that the statements were inadmissible.

◼ The prosecutor is next accused of causing Stanley Cochran to delay the entry of his pleas of guilty, although it is argued that Stanley desired to so plead from the trial's inception, in order to introduce the testimony of another witness to implicate both Stanley and Bland with testimony that could not have been elicited from Stanley himself. This argument is unpersuasive. As the trial judge correctly noted, Stanley was separately represented by his own attorney throughout the trial and long before it commenced. He was meticulously advised of his rights and expressed satisfaction with his counsel. We find it difficult to understand how the prosecutor could have stood in the way of Stanley's guilty pleas, except by some promise in a plea bargain, but there was no showing that such a bargain had been made. Of course, the other witness' testimony would have been entirely unnecessary had Stanley decided earlier to change his pleas to guilty. It is obvious that when the evidentiary noose was tightened by the witness' testimony, Stanley decided to change his plea to guilty and testify. We find no merit to the charge that the prosecutor struck a foul blow in delaying the time of Stanley's pleas in order to obtain an undue trial advantage.

Characterizing the actions of the prosecutor as an overkill in introducing evidence that Parker, Stanley, and Reginald committed flim-flams and other crimes at various times and places unconnected with Officer Bland, Bland argues that this evidence presented the picture that all of the defendants on trial were people of bad character and that he was therefore prejudiced. We disagree.

The record is replete with limiting instructions given by the court with respect to which specific defendant or defendants the particular evidence was either admitted against or excluded. Other instructions were to the effect that the testimony could be considered only with respect to the issues of knowledge and intent.

Curiously, at trial, counsel for Bland took the opposite tack—that evidence of other flim-flams committed by his codefendants (except Watson) in which he did not participate inured to his benefit. Before any evidence was taken, Bland's counsel announced his intention of showing by cross-examination that Parker and the Cochrans had been involved in many flim-flams over the years and that some one other than Bland was used as a "blow-off" man. He pursued this strategy during the trial by eliciting from Parker the fact that over the past fifteen years he had been involved in at least twenty flim-flams.

◼ In any event, testimony by co-conspirators Parker and Stanley Cochran concerning numerous flim-flams and other criminal activity over a long period of time was admissible to support an argument by Bland that, while his co-defendants had engaged in flim-flams, Bland had never before been involved; it was also admissible to support an attack on the credibility of the co-conspirators developed by Bland on cross-examination, and it was substantially relevant to the Government's proof of an element of the offenses as to the Cochrans under the "similar acts" doctrine. As Judge Goldberg recently well-stated it:

> The clear rule is that although evidence introduced in a criminal trial should relate only to the specific offense charged, *prior or subsequent* incidents may be introduced to establish that a defendant possessed a reguisite [sic] knowledge or intent or that

388

there is a consistent pattern, scheme of operations, or similarity of method. United States v. Alston, 5 Cir. 1972, 460 F.2d 48. *See also* United States v. Harrison, 5 Cir. 1972, 461 F.2d 1127. Of course, the probative value of the evidence offered to show "system and intent" must be balanced against any inflammation or prejudice that may result from the nature of the evidence offered. That balancing, however, is left largely within the sound discretion of the trial judge. *See, e. g.,* United States v. Byrd, 2 Cir. 1965, 352 F.2d 570.

United States v. Goodwin, 5 Cir. 1972, 470 F.2d 893, 899, cert. denied, 1973, 411 U.S. 969, 93 S.Ct. 2160, 36 L.Ed.2d 691 (emphasis in original). *Cf.* United States v. Kasouris, 5 Cir. 1973, 474 F.2d 689. We are convinced that no abuse of discretion occurred when the court below admitted the evidence in question.

Next in the series of prosecutorial acts complained about, the defendants accuse the prosecutor of having elicited, on four occasions during the trial, and then having argued to the jury, that witnesses Parker, Tedder and Stanley Cochran either were afraid or had requested protection, and further, that defendant Bland had told witness McCullers that Reginald Cochran had a "contract out" on another witness. Defendants argue that the prosecutor created an atmosphere that cast them in the role of violent and dangerous characters, habitual lawbreakers or murderers for hire, and that this was done to ensure punishment of the defendants irrespective of their guilt or innocence of the crimes charged.

In the context in which these matters arose, the defendants' arguments are both inaccurate and overbroad. The four specific instances referred to by the defendants cannot be isolated from five weeks of a bitterly fought trial with coruscating counsel for the defense and for the Government each tuned for a joust made necessary by the other's challenge. Thus, we must place each instance complained of in its proper setting.

After the indictment in this case was returned, Parker gave a full confession to the prosecutor and to the FBI. About two months later, Bland's private investigator interviewed Parker, during which Parker did not inform the investigator of his confession or admit that he knew Bland. On cross-examination Parker admitted that his statement to the investigator was a lie, and this was emphasized by counsel as affecting his credibility. On redirect examination, in response to an inquiry why he had made a false statement to the investigator, the following ensued:

A. I didn't know he was an investigator, Mr. Dempsey, I was just told that he was. . . . I just merely was taking precautions for myself.

Q. For what reason?

A. Because I felt that if they found out at that time, that possibly there could be bodily harm or something. I had a family out there I was looking out for at the time.

On recross examination Bland's counsel underlined the evidence by again having Parker reiterate that he thought it necessary to take precautions for himself. Further examination by the prosecutor brought a response from Parker that he was informed that protection would be provided if necessary.

It would seem clear that the evidence complained of falls squarely within "the basic principle that a witness impeached on the basis of prior inconsistency 'may always endeavor to explain away the effect of the supposed inconsistency by relating whatever circumstances would naturally remove it,' 3 Wigmore, Evidence, § 1044, p. 737 (3d ed. 1940). . . . Fear of the consequences of plain speaking is such a circumstance. . . ." United States v. Franzese, 2 Cir. 1968, 392 F.2d 954, 960, vacated on other grounds, 1969, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297; Unit-

ed States v. Pritchard, 7 Cir. 1972, 458 F.2d 1036, 1039–1040, cert. denied, 1972, 407 U.S. 911, 92 S.Ct. 2434, 32 L.Ed.2d 685; United States v. Scandifia, 2 Cir. 1968, 390 F.2d 244, 250–251, vacated on other grounds, 1969, 394 U.S. 310, 89 S. Ct. 1163, 22 L.Ed.2d 297; Carbo v. United States, 9 Cir. 1963, 314 F.2d 718, 743–744, cert. denied, 1964, 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498.

Defendants' reliance on Hall v. United States, 5 Cir. 1969, 419 F.2d 582, and United States v. Carney, 3 Cir. 1972, 461 F.2d 465, is misplaced. During argument the prosecutor in *Hall* asserted, without any evidentiary support, that a witness was afraid of the defendant, and tried to imply that the defendant had tampered with the witness. The court did not hold that evidence of fear is inadmissible, but rather, that under the facts there presented, the argument that a witness was fearful was improper because it was not based on any evidence. In *Carney* an unimpeached witness' testimony that the defendant had tried to kill him and his children was brought out on direct examination and without a showing that the threats had any connection with the case in which the witness testified. In contrast, we find no error, prosecutorial or otherwise, with respect to the evidence elicited from the witness Parker.

■ Next, the defendants point out that the prosecutor adduced the testimony of witness Tedder that he, Tedder, and his brother, while in Tampa with the Cochrans, asked to be arrested for their own protection. The record simply does not bear this out. It was not the prosecutor but Bland's counsel who first broached this subject on cross-examination:

Q. And sometime later that evening, do you recall being arrested by the [FBI]?

A. Yes. Because I asked to be.

Q. You mean you asked the law enforcement officials, meaning the FBI and the State officials, to arrest you?

A. That's right.

Q. And you asked them to arrest you on a pretext, a false arrest?

A. No sir, for my protection.

Q. So at the Howard Johnson's earlier in the day you were arrested by Detective Cloud?

A. They were not going to hold me. The police or FBI and I asked to for my own protection.

None of the other defendants objected to this cross-examination. It was only then that the prosecutor on redirect examination, without objection, asked similar questions to underscore the fact that both the witness and his brother had requested that they be arrested for their own protection. As this Court has previously stated: "Defense counsel may not complain of what became visible through a door deliberately opened by him." United States v. Millican, 5 Cir. 1970, 424 F.2d 1038, 1040.

■ The defendants next accuse the prosecution of introducing evidence through Stanley Cochran that he feared harm in the county jail where he was incarcerated with his father. The record, however, shows a different origin of this evidence. Nothing relating to a change of the place of Stanley's confinement was mentioned on direct, cross or redirect examination. Watson's counsel on recross first explored the subject, and a brief inquiry was thereafter made by both the prosecutor and Bland's counsel. Suffice it to say that no objection was made by any other defendant to matters brought up by a co-defendant. We will not notice matters which were not presented to the district court except to prevent a miscarriage of justice, which clearly is lacking here. Rule 30 F.R. Crim.P.; United States v. Knox, 5 Cir. 1972, 458 F.2d 612, cert. denied, 1972, 409 U.S. 845, 93 S.Ct. 48, 34 L.Ed.2d 85; United States v. Hall, 5 Cir. 1971, 440 F.2d 1277; D. H. Overmyer Co. v. Loflin, 5 Cir. 1971, 440 F.2d 1213, cert. denied, 1971, 404 U.S. 851, 92 S.Ct. 87, 30 L.Ed.2d 90.

**390**

A more substantial contention is made by the defendants that the prosecutor elicited testimony from McCullers, a policeman, that co-defendant Bland had told him that the "Georgia boys had a contract out" for Government witness and FBI informant Dyal. Objection was made and sustained during the trial, and the court carefully instructed the jury when this incident occurred.

 The genesis of this testimony was an interview that Bland had with McCullers at McCullers' home after the afternoon recess of the day when Dyal testified for the Government. During this conversation, Bland made derogatory remarks about Dyal and allegedly stated that the "Georgia boys" had a "contract" out for him. On cross-examination, Bland denied telling McCullers anything about a contract out on Dyal's life. McCullers was then called as a rebuttal witness and contradicted Bland entirely in this regard. On recross by Bland, McCullers was pressed for the identity of the "Georgia boys:"

Q. Officer, did you consider the fact that someone had a contract out on another individual as raising the possibility of a crime being committed?

A. Yes, sir.

Q. Well, didn't you ask Major Bland who the Georgia boys were, so that you could go down and have them prosecuted?

A. No, sir. He already indicated that.

Q. He indicated that to you?

A. Yes, sir.

Q. Is that in your report?

A. No, sir.

Q. As a matter of fact, you say in your report that he makes no mention whatsoever or reference to any individual.

There was an objection at this point by the prosecutor which was overruled.

A. He referred to the Georgia boys.

Q. I mean, did you ask him, so that you could effectively prosecute the Georgia boys for a threat on Lloyd Dyal's life, who they were?

Another objection by the prosecutor was overruled.

Q. Would you answer that question?

A. Yes, sir.

Q. You did ask him who they were?

A. No, I didn't ask him the names, but in relation to the investigation I inferred that the Georgia boys were probably the Cochrans, father and son.

The court immediately instructed the jury to disregard that answer as speculative, cautioning the jury that there was no evidence in the case from which any such inference could be drawn. Under the circumstances, we think that if the evidence was inadmissible, and we have serious doubt that it was, the instruction given by the court was sufficient to overcome reversible error.

 First, it was not the prosecutor who initiated the identification of the "Georgia boys," but was instead Bland's counsel. Second, that Bland would make such a statement concerning a witness who had just testified that day for the Government was, we think, admissible as going to Bland's motivation and bias in connection with his own testimony. Of course, the fact that Bland made such a statement did not tend to prove that Reginald Cochran actually made a threat concerning Dyal, and he would have been entitled to an instruction to that effect. United States v. Franzese, *supra*, 392 F.2d at 960. In fact, the instruction given by the court was more beneficial to Cochran than would have been an explanatory instruction, *i. e.* that Cochran was entitled not to have the jury take Bland's statement as substantive evidence against him, although Bland was not entitled to be relieved of the consequences of having said it. Moreover, we agree with the district court that McCullers' testimony had no spillover effect on Bland or Watson, because their alibi defense and

their tactical approach throughout the trial were separate and distinct from that of Cochran.

Finally, the defendants assert, and the Government concedes, that the prosecutor improperly asked Stanley Cochran whether he had had a conversation with Bland's counsel, in which the attorney allegedly told Stanley that he had done the right thing in pleading guilty since the evidence was sufficient to convict him and his father, Reginald. Regardless of some provocation (lengthy cross-examination of Stanley pointing to a probable deal between him and the prosecutor which they were trying to conceal from the jury), the question was improper. An objection was sustained, and again the court carefully and properly instructed the jury that they were to disregard this matter.

The district court gave studied attention to the problem both at the time that it arose during the trial and upon the defendants' motion for a new trial. It concluded, and we agree, that the proof against Reginald Cochran, "both direct and circumstantial, was so convincing and overwhelming that no jury could have entertained a reasonable doubt concerning his guilt." The error was therefore harmless beyond a reasonable doubt. Harrington v. California, 1969, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284. *Cf.* Donnelly v. DeChristoforo, 1974, 416 U.S. 637, 94 S.Ct. 1868, 40 L. Ed.2d 431. And again, because of the nature of their defense and the fact that their tactical approach throughout the trial was separate and distinct from that of Reginald, there was no spillover effect on the other defendants.

As a wrap-up of claimed prosecutorial misconduct, the defendants extract a dozen or so instances from a voluminous transcript to emphasize how the prosecutor employed speaking objections, testimonial questions, and the characterization of testimony in his interrogation of witnesses. But it was not all one-sided. Counsel for defendants were, on an equal number of occasions, admonished by the court for act-

ing outside the bounds of proper trial techniques. All of this was *de minimis* in a five-week trial. And it is noteworthy that counsel for all parties demonstrated a concern for a fair trial by disclosing in advance in bench conferences and in chambers evidentiary matters that they proposed to inquire into which might have raised problems concerning admissibility. This is professionalism of the highest order. And in this long and difficult trial, the district court kept the proceedings on an even keel by courteously and attentively listening to the objections of counsel, and then promptly and firmly ruled on the thorny questions posed. "After reviewing the record of the incidents, statements and arguments alleged to have been prejudicial, we conclude that they were not so misleading, inflammatory or prejudicial as to deny defendants a fair trial." United States v. Burke, 5 Cir. 1974, 495 F.2d 1226.

## MOTION FOR SEVERANCE

We turn now to Bland's contention that the court's refusal to grant his motion for a severance, so as to permit him to present not only exculpatory evidence but also evidence to impeach the credibility of Government witness Parker, constitutes reversible error. We deal with the matter of impeachment first. Bland's proffer was that Reginald Cochran would testify that Parker had stated to him that he, Parker, had participated in a robbery in Ringgold, Georgia in 1968. Parker had previously denied this when he was under cross-examination by Bland's counsel. The district court ruled, and properly so, that even if Cochran were to testify, it would amount to no more than purported impeachment with regard to collateral matters having nothing to do with the issues of the case and would not tend to show bias for or against any defendant. Moreover, the proffer that Reginald was willing to testify was conditioned on the absence of pending charges.

With respect to Bland's proffer that in a separate trial Watson and

Reginald Cochran would wholly exonerate Bland, the court was informed by their respective counsel that neither Cochran nor Watson would testify, even if a severance were granted, if they remained as defendants in this case. Under these circumstances, the court, in its discretion, properly denied the motion for severance. In United States v. Burke, *supra*, we pointed out that:

> Rule 14, F.R.Crim.P., provides that a motion for a severance is addressed to the discretion of the trial judge. Opper v. United States, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954); Smith v. United States, 385 F.2d 34 (5th Cir. 1967). To challenge successfully the refusal of a trial judge to grant a motion to sever, an appellant must show "prejudice resulting in the denial of a fair trial." United States v. Martinez, 486 F.2d 15 (5th Cir. 1973); United States v. Nakaladski, 481 F.2d 289 (5th Cir. 1973). In Byrd v. Wainwright, 428 F.2d 1017 (5th Cir. 1970), we enumerated guidelines for evaluating motions for severance based on a desire to offer exculpatory testimony of a co-defendant. (footnote omitted)

In brief the *Byrd* guidelines provided that (1) the testimony must be exculpatory in effect; (2) the testimony must be more than purely cumulative, or of negligible weight or probative value; and (3) there must be a likelihood that the co-defendant will be willing to testify if the defendant is tried separately. *Id.*, 428 F.2d at 1020, 1021. We further said in *Byrd:*

> The court is not required to sever where the possibility of the codefendant's testifying is merely colorable or there is no showing that it is anything more than a gleam of possibility in the defendant's eye. "The unsupported possibility that such testimony [exculpatory testimony of a codefendant] might be forthcoming does not make the denial of a motion for severance erroneous." United States v. Kahn, 381 F.2d 824, 841 (7th Cir. 1967). *Accord,* Tillman v. United States, 406 F.2d 930, 936 (5th Cir. 1969). In this circuit we have referred to the codefendant's being "more likely to testify were he [the movant] tried separately." Smith v. United States, *supra,* 385 F.2d at 38. (footnote omitted)

Here there was not even a likelihood that the co-defendants would testify, even if a severance were granted, so long as they remained defendants in this case. The district court thus properly exercised its sound discretion in denying a severance. *Cf.* United States v. Perez, 5 Cir. 1973, 489 F.2d 51, 65.

## ADMISSIBILITY OF IDENTIFICATION EVIDENCE

Bland next makes a triple-barreled attack on the admissibility of evidence identifying him as the "blow-off" man at the Holiday Inn on April 2, 1971, when the flim-flam took place. He accuses the prosecutor of circumventing a court order suppressing Bland's identification by the victim Letizia; argues that there was no evidentiary predicate for the admission of Government Exhibit 110 (the paper on which Letizia wrote the license number of Bland's car as he was departing the flim-flam site); and complains that it was error to exclude the results of a polygraph examination of Letizia in regard to his identification of Bland's car at the Holiday Inn. We find none of the contentions persuasive.

The first two assertions are interrelated. On a motion to suppress made between the first and second trials, Letizia's identification of Bland was excluded. The admissibility of Exhibit 110, however, was not ruled upon. Bland now seems to argue that because improper methods were used by the Tampa Police Department that gave rise to Bland's identification by Letizia resulting in an exclusion order as to Letizia, the Government was precluded from proving by any other witness or by any other means the fact that Bland was at the Holiday Inn on April 2, 1971, and that the prosecutor therefore once again exceeded the bounds of fundamental

fairness. Further, Bland suggests that no testimony was presented concerning the circumstances under which Exhibit 110 was made.

Bland's first argument is obviously unsound, and the record belies his second assertion. It was entirely proper for the prosecutor to establish by cross-examination of Bland, and without timely objection, that he had been identified at the site in question. Furthermore, while Bland was "patting down" Parker as a part of the flim-flam, Parker saw Letizia looking at them and heard him say: "Goddam, another flim-flam." The desk clerk at the Holiday Inn saw Letizia rush into the lobby, pick a pen from the hand of a registering guest and a piece of paper from the desk, and then run outside. Letizia returned shortly and asked the clerk to call the police, because he had "been taken." He then wrote his name on a piece of paper and left it with the clerk. When Officer Leary arrived on the scene, he was met by a highly upset Letizia, who handed the officer the hotel reservation form with the tag number written on it. FBI Agent Arwine, who obtained a statement from Letizia, fully corroborated these events.[4] This then was direct evidence identifying Bland at the scene of the flim-flam and a sufficient evidentiary predicate for the introduction of Exhibit 110.

Bland's attempt to counter this evidence by introducing the results of a polygraph test of Letizia, purportedly showing that Letizia was lying, gives us little pause. Letizia was not a witness and therefore was not the subject of impeachment. In any event "the rule is well established in federal criminal cases that the results of lie detector tests are inadmissible. United States v. Rodgers, 419 F.2d 1315, 1319 (10th Cir. 1969); Frye v. United States, 54 App. D.C. 46, 293 F. 1013 (1923)." United States v. Frogge, 5 Cir. 1973, 476 F.2d 969, 970, cert. denied, 1973, 414 U.S. 849, 94 S.Ct. 138, 38 L.Ed.2d 97. *See also* United States v. Pacheco, 5 Cir. 1974, 489 F.2d 554, 566; United States v. Sockel, 8 Cir. 1973, 478 F.2d 1134.

Bland concludes his argument on appeal by ascribing as error the district court's refusal of his request to limit contact between the prosecutor and a Government witness during a noon recess, while the witness was still on direct examination. We find no merit to this contention. *Cf.* United States v. Burke, *supra.*

### EFFECTIVE ASSISTANCE OF COUNSEL

Finally, Watson urges that since his counsel, Gonzalez, previously represented Government witness-informer Dyal in a moonshine case, the confidential attorney-client relationship between Dyal and Gonzalez precluded Gonzalez from effective cross-examination of the witness and thus deprived Watson of effective assistance of counsel. The district court denied a motion for mistrial. We find no error.

A brief chronology of events puts this issue in proper perspective. Dyal testified for the Government on January 19,

---

4. Bland's counsel examined Agent Arwine about Letizia's statement and elicited the following concerning Exhibit 110:

 When I interviewed Mr. Letizia along with Special Agent Clifford Munger, Mr. Letizia told me that as he went out the door and he realized that he had been taken, that he yelled, "I've been robbed! Get that license number!"—he immediately turned around, went back in—he said he got the license number, went back into the clerk, asked for a pen, got the pen, wrote the number down. At this time the other individual who was with him had also taken the number down. That he came in, this individual supplied this number, they checked the numbers, and as my interview shows, they agreed. Both agreed that this was the license number that they saw leave. (Tr. C–1145).

 They both agreed, and they both had the same number written down. From my understanding of my interview with Mr. Letizia, both of them had the same number written down. They checked it, and as my report shows, they agreed that this was the number that both of them saw on the 1970 Chevrolet as it left the Holiday Inn. (Tr. C–1147).

1973, concerning three conversations that he had with Reginald Cochran, two occurring before and one shortly after the flim-flam. Dyal testified that Cochran told him about the Tampa arrangement, named some of the participants, including Watson, with whom he, Dyal, was acquainted, and further testified that Cochran told him that a Tampa police officer would also participate. After the flim-flam, Cochran told Dyal that "the heat was on" and that he had to send his own share of the flim-flam proceeds back to Watson in an effort to get Letizia not to press charges.

During a bench conference following the introduction of this evidence on Friday morning, January 19, Bland's counsel announced his intention of cross-examining Dyal with reference to Dyal's obtaining Gonzalez (Watson's counsel) to represent the Cochrans and Parker in their state court criminal proceedings. Gonzalez' response at this conference was: "I did represent the Cochrans and Parker in the state court. That's one of the reasons why I did not attempt to go into that matter carefully in the questions that I asked Tommy Parker." Gonzalez said nothing at this time with regard to his prior representation of Dyal.

During another bench conference in the afternoon of January 19, the prosecutor asked Gonzalez if he was not the attorney of record for Dyal in a "still" case, to which Gonzalez replied, "Oh yes. It was at some level. I don't recall whether it was at the trial or appellate level." Again there was no indication of any conflict of interest.

Bland's counsel subjected Dyal to a lengthy and searching cross-examination. After other counsel had concluded their cross, the court asked Gonzalez if he had any questions, to which he responded, "Not at this time," although he later requested that Dyal be kept in attendance.

On Tuesday afternoon, January 23, 1973, Bland's counsel announced at a bench conference that he planned on calling Gonzalez, who had represented Dyal, as his witness. This evoked no response from Watson that there was a conflict of interest in Gonzalez' representation of Dyal and Watson.

Finally, on Thursday morning, January 25, 1973, six days after Dyal's testimony, a motion for mistrial and severance was filed by another attorney in behalf of Watson, alleging *inter alia:* "That there are areas of cross-examination of the witness Dyal which are vital to the defendant Watson's defense which his trial counsel, Henry Gonzalez, Esquire, has not been able to and cannot afford him." This was followed by a written proffer of the evidence that Dyal, Watson and Gonzalez would give in support of the motion. The district court found that the motion was insufficient and denied it.

■ Our review of the record, the motion and the proffer convinces us that Watson was not denied effective representation because of Gonzalez' previously concluded representation of Dyal. First, it seems passing strange that although Gonzalez previously represented Parker and Stanley Cochran in connection with state criminal proceedings arising out of the events of this very case, his ability to cross-examine these witnesses was not alleged to be impaired. Secondly, no objection or motion was made by Gonzalez during or after the conclusion of Dyal's testimony. It was four witnesses and six days later that the motion for mistrial was filed. We are persuaded that this tactic was a belated afterthought. Finally, we have found nothing in the record or briefs which would indicate, or even suggest, that Gonzalez' concluded representation of Dyal precluded any relevant line of inquiry he might have pursued which was not already exhausted by the examination conducted by other counsel. Not once has it been made to appear what areas of cross-examination of Dyal, Gonzalez was not able to and did not afford his client, Watson.

We have examined all of the appellants' assertions, and after a thorough review of the record we have found them to be without merit. Accordingly the judgment below is

Affirmed.