**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Joe Raymond DIEZ and Peter A. Palori, Defendants-Appellants.**

**No. 74–2641.**

United States Court of Appeals, Fifth Circuit.

July 14, 1975.

Rehearing Denied Aug. 22, 1975.

Rehearing and Rehearing En Banc Denied Sept. 26, 1975.

Raymond E. LaPorte, Tampa, Fla., for Diez.

E. David Rosen, Miami, Fla., for Palori.

John L. Briggs, U. S. Atty., Bernard Dempsey, Asst. U. S. Atty., Jacksonville, Fla., Claude Tison, Jr., Asst. U. S. Atty., Tampa, Fla., for plaintiff-appellee.

Before GIBSON,* THORNBERRY and AINSWORTH, Circuit Judges.

AINSWORTH, Circuit Judge:

Peter A. Palori and Joe Raymond Diez appeal from convictions of conspiring to defraud the United States by impeding the Internal Revenue Service in the collection of income tax in violation of 18 U.S.C. § 371. Palori also appeals from his conviction on four counts of income tax evasion. 26 U.S.C. § 7201. Both defendants assign numerous errors in the trial court's rulings concerning the admissibility and weight of hearsay evidence, the propriety of a joint trial of the defendants, and the possibility of prejudice from the Government's use of illustrative charts.

## I. Factual Background

The Government's case against Palori and Diez involved a series of real estate transactions in Tampa, Florida, between 1965 and 1968. The Government's theory was that Palori was the real owner of shares of the various parcels sold in these transactions, but that he had arranged for several of his relatives to act as nominal owners or brokers in the transactions and to report part of the profits from the sales on their own tax returns. Palori's mother, Minnie Lopez, reported profits from a number of the transactions on her returns and was indicted as a member of the conspiracy but acquitted. Diez, who is Palori's uncle, reported part of the profit from one of the transactions, as well as two brokerage commissions allegedly received in connection with other transactions, and interest on a loan he allegedly made to Palori. B. J. DeGuzman, Palori's accountant during the tax years in question, reported part of the profit from one of the real estate transactions, and was indicted and convicted both for his role in the conspiracy and for preparing false returns—specifically those of Palori and his relatives.[1] The Government contended that all of this income was properly attributable to Palori. James Garrett and Clarence Prevatt, two unindicted coconspirators, also participated in some of the transactions.

## II. Evidence Allegedly Admitted in Violation of the Hearsay Rule

### A. Statements of Coconspirators

■ Palori and Diez contend that it was error to permit the introduction of several statements by Garrett and DeGuzman, two of their coconspirators, which, they argue, were inadmissible under the hearsay rule. The general principles governing the introduction of out-of-court declarations by one conspirator against another, for the truth of the matter stated, are clear:

> It is established law, at least since *Krulewitch v. United States*, 1949, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790, and under so many cases prior to and following *Krulewitch* that it would be an affectation to cite them, that acts and declarations of co-conspirators are binding upon each member of the conspiracy, if made during the life of the conspiracy and in furtherance of any of its objects.

United States v. Harrell, 5 Cir., 1970, 436 F.2d 606, 613. *See* United States v. Register, 5 Cir., 1974, 496 F.2d 1072, 1078.

■ The statements complained of were part of the testimony of Agents Brock and Hill of the Internal Revenue Service. Brock testified that DeGuzman told him, in an interview in November 1970, that during a prior audit another agent, named Hunting, had proposed to classify Palori as a dealer in real estate,[2]

---

* Of the Eighth Circuit, sitting by designation.

1. DeGuzman did not appeal his conviction.

2. The fact that DeGuzman's statement, like numerous others introduced at trial, relied on a statement by another person does not render the testimony inadmissible. Agent Hunting's statement, reported to Agent Brock by DeGuzman, was a statement of his intention to classify Palori as a dealer in real estate. The statement was received not to prove that Palori was or had been classified as a dealer, but rather to prove that Agent Hunting intended to regard him as one. The statement was thus a "statement of the declarant's then existing state of mind, emotion, sensation, or physical

and thus as ineligible for the special tax treatment usually given long-term capital gains.[3] DeGuzman also stated in interviews during July 1969 and July 1970, according to the testimony of Agents Brock and Hill, that he and Minnie Lopez had paid fees and brokerage commissions to Diez in connection with several of the real estate transactions in the case.[4]

According to Agent Brock's testimony, in an interview during January 1972 Garrett stated that Diez "didn't participate as a partner in any of Mr. Palori's real estate transactions, nor did he perform any services which would entitle him to a commission." This statement, in contrast to that of DeGuzman concerning payment of fees and commissions, supported the Government's contention that income properly belonging to Palori was being attributed to Diez as part of the conspiracy. Agent Brock, testifying as an expert witness, also stated that in computing Palori's income for 1965 he disregarded a check from Palori to Garrett, allegedly for the latter's interest in a parcel sold in one of the transactions, because Garrett had told him (in the January 1972 interview) that he did not own an interest in the parcel in question.[5]

Palori and Diez contend that these hearsay statements were, at most, attempts to conceal the completed crime, and thus could not be introduced under the coconspirator exception to the hearsay rule. A review of the prior Su-

condition (such as intent, plan, motive, design, mental feeling, pain and bodily health)" and falls under the well-established exception to the hearsay rule for such statements. Fed.R. Evid. Rule 803(3). DeGuzman was therefore a competent witness to Hunting's statement, just as Agent Brock was a competent witness to DeGuzman's statement under the coconspirator rule. "Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." Fed.R.Evid. Rule 805.

The Federal Rules of Evidence were approved by Congress on January 2, 1975, and take effect on the one hundred and eightieth day thereafter. The Rules are to be applied even in advance of their effective date "except to the extent that application of the rules would not be feasible, or would work [an] injustice." United States v. Rivera, 2 Cir., 1975, 513 F.2d 519. See United States v. Arias-Diaz, 5 Cir., 1974, 497 F.2d 165, 170.

3. Palori made no objection to the introduction of this statement, either on the basis of the hearsay rule or on the basis of irrelevance, and admission of the testimony was not plain error. Wright, Federal Practice and Procedure: Criminal § 856 (1969). Therefore, it seems doubtful that we can consider this assignment of error as to Palori. Moreover, Agent Hunting was available and testified at trial. Neither Palori nor Diez has explained why they did not attempt to cross-examine him or call him as a witness on this issue.

4. Because DeGuzman's statement is consistent with Palori and Diez's version of the facts, it is unclear how admission of this testimony prejudiced defendants. Moreover, when Agent Brock first interviewed Diez he specifically referred the agent to DeGuzman for answers to any questions concerning his taxes. DeGuzman's statement, therefore, would appear to be an "admission by an authorized agent," Hayes v. United States, 5 Cir., 1969, 407 F.2d 189, 192, and therefore would be admissible irrespective of whether the coconspirator exception applies. In *Hayes* the accountant acted pursuant to a written power of attorney, but we know of no precedent requiring authorization by a written instrument.

5. This testimony is largely repetitive of earlier testimony by Agent Brock. On cross-examination his testimony strongly suggested that Garrett had told him he held no interest in the property in question. No objection was made by defendants. His testimony on redirect examination, to which Palori objected, was largely repetitive of his answers on cross-examination.

Garrett's statement to the agents disavowing any ownership of a share in one of the parcels sold in 1965 was also introduced in the form of his tax return for that year, which contained no reference to gain from that sale. Palori contends that the tax return was inadmissible, relying on Greenbaum v. United States, 9 Cir., 1935, 80 F.2d 113, 125, which we cited approvingly in dicta in United States v. Ragano, 5 Cir., 1973, 476 F.2d 410, 417–418. Like the testimony on redirect concerning Garrett's oral statement to the agents, however, the information supplied by the tax return was merely repetitive of what Agent Brock had stated on cross-examination without objection. Under these circumstances, the admission of the tax return and Agent's Brock's statements on redirect examination was not erroneous or prejudicial.

preme Court cases convinces us that this argument must fail.

In Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949), the Supreme Court held inadmissible the hearsay statement of a coconspirator made after she had been apprehended. The Government argued that there was an implicit conspiracy to conceal the crime. The Court noted, however, that no such conspiracy to conceal had been charged in the indictment, and stated:

> It is beyond doubt that the central aim of the alleged conspiracy—transportation of the complaining witness to Florida for prostitution—had either never existed or had long since ended in success or failure when and if the alleged co-conspirator made the statement attributed to her.

336 U.S. at 442, 69 S.Ct. at 718.

In Lutwak v. United States, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953), a conspiracy to conceal the crime was charged in the indictment, but the Court interpreted *Krulewitch* to require more than an unsubstantiated allegation:

> This Court in *[Krulewitch]* rejected the Government's contention that in every conspiracy there is implicit an agreement as a part thereof for the conspirators to collaborate to conceal the conspiracy.

344 U.S. at 616, 73 S.Ct. at 489. The Court held in *Lutwak* that the Government had failed to prove a conspiracy to conceal the crime, and went on to discuss what kind of proof would be sufficient. *See* Grunewald v. United States, 353 U.S. 391, 403–405, 77 S.Ct. 963, 973–974, 1 L.Ed.2d 931 (1957).

■ It is unnecessary to apply the reasoning developed in these prior cases concerning proof of a conspiracy to conceal a completed crime, because the statements in question here were part of the central conspiracy itself, which had not terminated when those statements were made. In this case the Government charged a conspiracy to defraud the United States by impeding the Internal Revenue Service in the collection of income tax. This conspiracy is different from the conspiracies discussed in the cases relied on by defendants.

In *Krulewitch* the conspiracy was to transport a woman across state lines for prostitution in violation of 18 U.S.C. § 2421. That conspiracy clearly had ended when the arrested coconspirator made her statement. In *Lutwak, supra,* the conspiracy was

> " 'to defraud the United States of and concerning its governmental function and right of administering' the immigration laws and the Immigration and Naturalization Service, *by obtaining the illegal entry into this country of three aliens as spouses of honorably discharged veterans."*

344 U.S. at 605, 73 S.Ct. at 483 (emphasis added). The conspiracy to defraud was complete when the conspirators deceived the immigration officials into permitting them to enter the country.[6] The Court held that coconspirators' statements made later would not be admissible under the coconspirator exception to the hearsay rule. In *Grunewald, supra,* the conspiracy was to defraud the United States by preventing criminal tax prosecutions. The prosecutions were prevented through the procurement, by bribery, of "no prosecution" rulings from the Internal Revenue Service, and ended when the rulings were issued.

On the other hand, in the present case the central aim of the conspiracy was to deceive officials of the Internal Revenue Service, thereby inducing them to accept fraudulent tax returns as truthful and accurate. In light of the substantial possibility that the returns would be audited and investigated, the filing of the returns did not fully accomplish the pur-

---

**6.** The dissolution of the fraudulent marital relations, after the aliens had entered the United States but long before the indictments were handed down, left little doubt that the conspiracy to defraud the Government had ended.

pose of the main conspiracy, which, by its very nature, called for concealment.[7]

The Supreme Court described a very similar conspiracy in *Forman v. United States*, 361 U.S. 416, 423–424, 80 S.Ct. 481, 486, 4 L.Ed.2d 412 (1960):

> [T]he conspiracy was a continuing one extending from 1942 to 1953 and its principal object was to evade [taxes] for 1942–1945, inclusive, by concealing [the conspirators'] "holdout" income. This object was not attained when the tax returns for 1945 concealing the "holdout" income were filed. As was said in Grunewald, this was but the first step in the process of evasion. The concealment of the "holdout" income must continue if the evasion is to succeed.

In some circumstances it may be difficult to determine precisely when the deception has been accomplished in a conspiracy like this one.[8] A lapse of several years between the filing of the last fraudulent return and the initiation of investigative efforts by the Government might suggest that the conspiracy had succeeded in its purpose. Statements made during the course of such an investigation might be considered outside the scope of the coconspirator exception. That difficult determination is unnecessary in the present case, however, because an IRS audit of Palori's returns for 1965 and 1966 was undertaken in April 1968 even before the last fraudulent return involved here was filed. Thus the conspirators were clearly on notice that their activities had aroused suspicion and that further deception might be necessary to fulfill their purpose. At the time of the statements by DeGuzman and Garrett, it could not be said that the conspiracy "had long since ended in success or failure," as was true in *Krulewitch*. No charges had been brought, so the conspiracy could not be considered a failure, and the investigation had not been abandoned, so the conspiracy could not be considered a success.

"[T]he termination of a conspiracy generally is an issue to be determined on the facts of the individual case . . ." *United States v. Sarno*, 1 Cir., 1972, 456 F.2d 875, 878. We find no reversible error in the District Court's conclusion that, for purposes of admissibility, there was sufficient evidence that the statements in question were made during the course of the conspiracy. *See United States v. Nowak*, 7 Cir., 1971, 448 F.2d 134, 139; *Nassif v. United States*, 8 Cir., 1966, 370 F.2d 147, 151–152; *United States v. Hickey*, 7 Cir., 1966, 360 F.2d 127, 140–141; *United States v. Klein*, 2 Cir., 1957, 247 F.2d 908.

■■ Defendants contend that, even if made during the conspiracy, several of the statements made by DeGuzman and Garrett to the IRS agents cannot be considered in furtherance of the conspiracy.[9] Defendants argue that since the statements were consistent with the Government's position at trial, they must be considered as true; and true statements do not further a conspiracy to deceive. A statement need not be false in every detail, however, in order to have been

**7.** The conspiracy alleged in this case is similar to the Supreme Court's examples, in *Grunewald, supra*, of crimes that inherently involve concealment.

> Kidnapers in hiding, waiting for ransom, commit acts of concealment in furtherance of the conspiracy itself, just as repainting a stolen car would be in furtherance of a conspiracy to steal; *in both cases the successful accomplishment of the crime necessitates concealment.*

353 U.S. at 405, 77 S.Ct. at 974 (emphasis added).

**8.** In *Forman* the Supreme Court suggested that so long as acts of concealment continue beyond the filing of the returns, such conspiracies cannot be said to have "ended in success or failure" until either the conspirators are caught or the statute of limitations has run on any action to recover the evaded taxes. 361 U.S. at 424, 80 S.Ct. at 486.

**9.** The fact that Garrett and Prevatt were not made defendants in the case does not render the coconspirator exception inapplicable to them. *United States v. Nixon*, 418 U.S. 683, 700–701, 94 S.Ct. 3090, 3104, 41 L.Ed.2d 1039 (1974).

made in furtherance of a conspiracy to conceal and defraud. Deception rarely takes the form of an uninterrupted series of lies. A fair reading of the agents' interviews with DeGuzman and Garrett convinces us that, taken as a whole, the coconspirators' statements were deceptive in design, especially when considered in conjunction with the versions of the facts related to the agents by Palori, Diez and the others during the investigation. The truthfulness of isolated parts of the statements does not affect this conclusion. *Cf.* Bruton v. United States, 391 U.S. 123, 126, 88 S.Ct. 1620, 1622, 20 L.Ed.2d 476 (1968); United States v. Maddox, 5 Cir., 1974, 492 F.2d 104, 107.

B. Evidence Admitted Under the Business Records Act

■ The trial court received into evidence, over defendants' objections, several documents which the Government contended were admissible under the Business Records Act. 28 U.S.C. § 1732(a).[10] Defendants particularly objected to the introduction of work papers, given to the IRS agents by DeGuzman, showing that Palori had a one-third interest in a parcel of land sold in one of the transactions in the case, although Diez reported half

of the gain attributable to that one-third share on his own tax return for 1965. Defendants contend that proper foundation for introducing the papers as business records was lacking. We need not resolve that question, however, because DeGuzman's work papers, like his statements discussed earlier, were admissible under the coconspirator exception to the hearsay rule. The work papers were prepared shortly after the sale of the parcel in 1965, and thus were statements made during the course of the conspiracy. They also were in furtherance of the purpose of the conspiracy: the filing of false income tax returns.[11]

The remainder of the documents in question, objected to by Palori, are writings "made in [the] regular course of any business," 28 U.S.C. § 1732, and were otherwise qualified to be introduced under the Act. Palori does not dispute this, but raises other objections to the admission of these documents, which we deal with separately.

The Government offered in evidence the work papers of Clarence Prevatt's accountant, showing a profit of $24,612.91 on the sale of a parcel of real estate in 1968 and allocating $9,000 of that profit as Palori's share—$9,000 that Palori did not report on his 1968 return.

---

**10.** Section 1732(a) provides:

In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.

Rule 803(6) of the Federal Rules of Evidence provides:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . . . .

(6) Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events,

conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

**11.** As we noted earlier in connection with DeGuzman and Garrett's oral statements, the fact that DeGuzman's notations on the work papers coincided with the Government's version of the facts at trial does not mean that they were not in furtherance of the conspiracy.

The accountant testified that he prepared the work paper in the regular course of business, specifically in the course of preparing Prevatt's 1968 tax return. He also testified that Prevatt, an unindicted coconspirator in the case, had provided the information he used in his computations.

■ Apparently Palori's only objection to the introduction of this document is that, since the accountant could not testify to what Prevatt had told him concerning the ownership of the land, the same information could not come in by virtue of being preserved in a business record. We believe, however, that the accountant could have so testified, because Prevatt's statements to him were those of a coconspirator during the course and in furtherance of the conspiracy. The purpose of the conspiracy was to enable Palori to receive income from the various real estate transactions without revealing his participation in them as an owner and thus exposing himself to tax liability. The statements of the conspirators that were intended to facilitate the flow of funds to Palori were as much in furtherance of the conspiracy as were the statements designed to conceal the disposition of the proceeds of the transactions. Without Prevatt's directions to his accountant, which indisputably were given before the conspiracy ended, Palori would not have received his share of the proceeds from the sale, and a major purpose of the conspiracy would have been frustrated.

To establish Palori's intention to conceal his participation in one of the transactions in 1967, the prosecution offered a letter from an official of the title company that closed the sale, stating that Palori "did not want his name to appear because he did not think it was politically expedient that it do so."

The title company official testified that he wrote the letter in the regular course of business and that Palori himself was the source of his statement concerning the omission of Palori's name from the transaction.[12]

■ Palori contends that the title company officer's letter should not have been admitted because he was available to provide his own testimonial recollection of the facts in the letter. Availability of the declarant, however, does not bar introduction of a document under the Act. McCormick on Evidence § 311 at 728–729 (1972); Fed.R.Evid. Rule 803(6).

■ As further evidence of Palori's concealment of his participation in the transactions, the prosecution introduced a letter from an attorney for the seller of a parcel purchased and later resold by Palori. It stated that Palori was the actual mortgagor of the property, even though the parcel was held in the name of Minnie Lopez, Palori's mother. The attorney testified that he prepared the letter in the regular course of his business. He stated that he had written Mrs. Lopez to tell her where to send the mortgage payments, but she had failed to make the first payment. Garrett intervened, informing the attorney that Palori was the actual mortgagor of the property and would be making the payments.

Palori maintains that the attorney was uncertain of the source of his information, but a review of the attorney's testimony reveals this contention to be without merit. Furthermore, the fact that the attorney relied on Garrett's statement does not render admission of the letter violative of the hearsay rule. The statement was made in 1967, long before the conspiracy ended. It was in further-

---

12. Palori contends that the title company official could not remember whether Palori specifically directed that his name be kept out of the transaction or whether he simply drew that conclusion himself. A careful reading of the testimony to which Palori refers, however, shows that the official's uncertainty concerned a different part of his letter. In any event, the clear import of the text of the letter is that Palori had requested that his name not be mentioned, and a specific present recollection of that fact on the part of the writer of the letter is unnecessary.

ance of the conspiracy because the attorney had already brought foreclosure proceedings against Minnie Lopez. If Garrett had not intervened the conspirators could not have resold the property.

### III. Sufficiency of the Evidence as to Diez

■ Diez contends that the trial court erred in denying his motion for acquittal under Rule 29 of the Federal Rules of Criminal Procedure, because the evidence was insufficient for submission of the case to the jury. His argument is based chiefly on the paucity of references to his role in the conspiracy by the numerous witnesses at trial. Under the Government's theory of the case, however, Diez's role was amply established by the evidence.

The Government sought to prove that Diez had reported income that was not properly attributable to him. That the income was reported by Diez was established by introducing his tax returns for 1965, 1966, 1967 and 1968. The other half of the Government's case against Diez was more difficult, because it required proof that Diez had not earned the income in question and had not owned a share of the property that was the source of the sales proceeds listed on his return.

■ The prosecutor asked a number of witnesses whether they knew Diez, and many of them answered affirmatively. Diez argues that, because the prosecutor did not pursue the relevance of these witnesses' familiarity with Diez, his conviction was the product of guilt by association. It is true that mere association with members of a conspiracy is insufficient to establish a person's participation in the conspiracy,[13] but in this case it was the defendant's nonassocia-tion that proved his guilt. Despite his acquaintance with a number of the witnesses at trial, Diez was not mentioned as a participant in the real estate transactions by anyone but Palori and, in one statement, DeGuzman.

Simon Wooten, an associate of Palori who owned a one-third share of one of the parcels sold, indicated no knowledge of any participation in the transaction by Diez, who nevertheless reported the profit from a one-sixth interest in the property on his return. Gaston Fernandez, the real estate broker who handled the transaction, identified only Palori, Garrett, and Simon Wooten as owners of the land. Diez's name did not appear on any documents connected with the sale, and there was no record of any payment of sale expenses by him. Although the other owners received payments from Palori by check for their interests in the property, there was no record of any such check from Palori to Diez. DeGuzman's worksheet compiled during the preparation of Palori's 1965 tax return, lists one-third interests held by Palori, Garrett, and Simon Wooten.

Diez reported a $5,000 brokerage commission, allegedly paid by Minnie Lopez, from another real estate sale involved in the case. The broker who procured the purchase option by which the owners (Palori and others) acquired this land, however, knew of nothing Diez had done in connection with the property which would warrant receipt of a commission. The closing statements for this transaction show payment of commissions to several real estate brokers, but Diez is not among them. Although in all the other transactions Minnie Lopez paid sale expenses by purchasing cashier's checks with cash withdrawals from her

---

13. United States v. Oliva, 5 Cir., 1974, 497 F.2d 130, 134; United States v. Suarez, 5 Cir., 1973, 487 F.2d 236, 239; United States v. Martinez, 5 Cir., 1973, 486 F.2d 15, 24; United States v. Jackson, 5 Cir., 1970, 426 F.2d 305, 309; Jett v. United States, 5 Cir., 1968, 393 F.2d 139, 140; Causey v. United States, 5 Cir., 1965, 352 F.2d 203, 207; Panci v. United States, 5 Cir., 1958, 256 F.2d 308, 312; United States v. Cantone, 2 Cir., 1970, 426 F.2d 902, 904. Cf. United States v. Menichino, 5 Cir., 1974, 497 F.2d 935, 942–943; United States v. Edwards, 5 Cir., 1974, 488 F.2d 1154, 1158.

savings account, there was no such check payable to Diez.[14]

Diez also reported a $6,000 commission, allegedly paid to him in cash by DeGuzman, in connection with another real estate transaction involved in the case. Like Minnie Lopez, DeGuzman consistently made payments by check in the other transactions. The real estate broker who helped Palori and Garrett obtain an option to purchase on the property, which was later sold, testified that he knew of no efforts by Diez in connection with the property which would warrant receipt of a commission.

Finally, Diez reported as his income $3,200 allegedly paid to him by Palori as interest on a loan. Palori's records contain no indication, however, of such payments. Nor is there any evidence that any such loan was made to Palori by Diez.

The pattern of Diez's reporting of income also reinforced the Government's case. For three of the four years in question (1965–1968), Diez reported substantial losses consistently in excess of his gains from the real estate transactions. In 1966, the only year in which Diez reported no losses, no gains from commissions or the sale of real estate were reported on his return.

Against all this evidence there was only the out-of-court statement of DeGuzman (to which Agent Brock testified) concerning his payment of a commission to Diez, for which he furnished an alleged receipt, and the testimony of Palori, who stated that Diez participated in all of the transactions from which he reported income, but had been paid in cash each time and had participated without the knowledge of anyone but himself, DeGuzman, and Minnie Lopez.

The standard we must apply in reviewing a denial of a motion for acquittal is clear. "The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). That the Government's case rested in substantial part on circumstantial evidence does not change that standard. Id.; United States v. Prince, 5 Cir., 1974, 496 F.2d 1289, 1293; McFarland v. United States, 5 Cir., 1960, 273 F.2d 417, 419. "Circumstantial evidence in this respect is intrinsically no different from testimonial evidence." Holland v. United States, 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954). See United States v. Miller, 5 Cir., 1974, 500 F.2d 751, 763. Our examination of the evidence and application of the appropriate standard of review compels the conclusion that the trial court did not err in denying Diez's motion for acquittal.

## IV. Defendants' Motions for Severance

Palori contends that the trial court erred in refusing to grant him a trial separate from DeGuzman's. Diez contends that the trial court erred in refusing to grant him a trial separate from Palori's. Both of these assignments of error are without merit.

### A. Palori's Motion

After the Government and the other defendants had rested and he had presented his evidence, Palori moved for a severance, alleging that DeGuzman would testify in his behalf if a separate trial was granted. Palori's proffer in support of his motion was, in its entirety, as follows:

14. At trial Palori offered a different explanation of Diez's receipt of the $5,000. He stated that Diez had made arrangements for sewerage hook-ups for a parcel sold in Minnie Lopez's name, and he had recommended that she pay Diez $5,000 for his services. The Government introduced evidence showing that Palori was aware of the need for sewerage hook-ups long before he allegedly commissioned Diez to look into the matter and had hired an expert engineer to solve the problem. Palori maintains that the engineer was hired in connection with sewerage hook-ups for another parcel sold in the same transaction, but that was a question for the jury.

He [DeGuzman] would be prepared to testify for and on behalf of Mr. Palori as to the manner and means by which he computed the taxes and his error or omission on the 1967 tax return. His advice from time to time on tax matters.

In Byrd v. Wainwright, 5 Cir., 1970, 428 F.2d 1017, we discussed the factors a trial court should consider in ruling on a motion for severance based on the unavailability of a codefendant whose testimony is allegedly needed. First, the movant must show a bona fide desire to use the codefendant's testimony. In *Byrd* the movant's assertions concerning the importance of the codefendant's testimony were made · "with full exploration of reasons." 428 F.2d at 1020. Here, in contrast, the defendant offered an unelaborated conclusory statement.

Second, the codefendant's testimony must be specifically shown to be exculpatory. United States v. Wilson, 5 Cir., 1974, 500 F.2d 715, 721. In this case the defendant's proffer not only lacked sufficient detail but also was bereft of exculpatory content. Palori had based prior motions for severance on the allegedly prejudicial effect of admissions made by DeGuzman during the investigation. His proffer contained nothing to erase this suggestion that DeGuzman would be a damaging, rather than exculpating, witness. The testimony briefly described in the proffer was irrelevant. Palori's defense was not that he relied in good faith on advice that proved to be incorrect. He contended that the transactions were exactly as represented on the various tax returns. As to the omission on Palori's 1967 tax return, Palori had already stated that the proceeds from one of the sales was left out of the return inadvertently. *See* United States v. Burke, 5 Cir., 1974, 495 F.2d 1226, 1234.

*Cf.* United States v. Shuford, 4 Cir., 1971, 454 F.2d 772, 778.

Third, the movant must show a substantial likelihood that the codefendant will testify if the severance is granted. In *Byrd* the prosecutor and other defense counsel advised the judge, before he ruled on the severance motion, that the codefendant would testify if a separate trial was granted. Here there is nothing to show why DeGuzman would be any more willing to testify in a separate trial than in a joint trial. *See* United States v. Cochran, 5 Cir., 1974, 499 F.2d 380, 391–392; United States v. Burke, *supra*, 495 F.2d 1226, 1234.

Finally, the trial judge should consider the timeliness of the motion and the effect of a severance on economy of judicial resources. Byrd v. Wainwright, *supra*, 428 F.2d at 1020; United States v. Burke, *supra*, 495 F.2d at 1234; United States v. Johnson, 5 Cir., 1973, 478 F.2d 1129, 1134. In the present case, Palori has offered no explanation for making his motion very late in the trial.[15] Having spent three weeks of trial time hearing the testimony of over sixty witnesses and considering over three hundred documents, the trial judge was not obliged to treat Palori's motion as he would an ordinary severance request made at the outset of a trial.

The granting of a motion for severance under Rule 14 of the Federal Rules of Criminal Procedure is within the trial court's discretion. *E. g.*, Opper v. United States, 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954); United States v. Burke, *supra*, 495 F.2d at 1233–1234; Byrd v. Wainwright, *supra*, 428 F.2d at 1018; Smith v. United States, 5 Cir., 1967, 385 F.2d 34, 38. We find nothing to indicate an abuse of discretion on the part of the trial court in denying Palori's motion.[16]

---

**15.** Palori's two prior motions for severance were not based on the contention that DeGuzman would testify in his behalf, and he has not contended on appeal that the denial of these earlier motions is error.

**16.** Palori alternatively requested that the court bifurcate the jury deliberations, so that DeGuzman's guilt or innocence could be resolved whereupon he would testify for Palori. This procedure would have been impractical and

## B. Diez's Motion

Diez contends that trying him with Palori was inherently unfair, because of the sheer complexity of the case and the impossibility of expecting the jury to restrict their consideration of evidence admitted against less than all the defendants. Closely related to this contention is Diez's assertion that the trial court's general instructions to the jury concerning the admissibility of evidence in a conspiracy trial were inadequate.

■ The complexity of a trial, by itself, is insufficient grounds for overturning a trial court's denial of a severance motion. In complex trials the pressures against severance are especially great, because of the drain on judicial resources that would be created by separate trials. See Byrd v. Wainwright, *supra*; United States v. Martinez, *supra,* 486 F.2d at 23.

The only specific evidence cited by Diez as prejudicing him in the joint trial was a record of zoning proceedings held by the Hillsborough County Commission in late 1966 and early 1967, and a financial statement given by Palori to his bank in September 1964. The minutes of the Commission proceedings were introduced to refute Palori's contention that he recommended to Minnie Lopez that she pay Diez a $5,000 commission for arranging sewer hook-ups to a parcel of property sold in her name in 1967. This evidence showed that Palori had been aware of the sewerage problem months before he allegedly commissioned Diez to look into the matter, and had hired an engineer to develop plans for sewerage connections. The minutes supported the Government's contention that Diez had not earned the $5,000 he reported on his 1967 tax return. They were admissible against both Palori and Diez as proof of the existence of a conspiracy to conceal Palori's income.[17]

■ Diez's objection to the admission of Palori's financial statement is also without merit. Palori furnished the statement to his bank in connection with an application for a loan several months before, under the Government's theory, the conspiracy began. The statement purported to list Palori's outstanding obligations, yet made no mention of a loan from Diez. By casting doubt on whether Palori had made a $3,200 payment of interest to Diez, the evidence supported the Government's charge of a conspiracy to conceal Palori's income. Although the court did not give an instruction to the jury cautioning that Palori's admission was not binding on Diez, or the other alleged coconspirators, such an instruction was given in connection with the introduction of a similar financial statement by Palori later in the trial. More importantly, the jury was repeatedly instructed throughout the trial that "[s]tatements of any conspirator which are not in furtherance of the conspiracy or made before its existence or after its termination may be considered as evidence only against the person making it." In light of these instructions we fail to see how Diez was prejudiced by the introduction of Palori's pre-conspiracy financial statement.

unwarranted. The jury could not have determined DeGuzman's guilt or innocence on the conspiracy count without coming to a conclusion concerning Palori's guilt or innocence on the substantive count, which would nullify the purpose of having the bifurcated deliberation in the first place.

17. Diez asserts that a cautionary instruction was necessary because this evidence was offered only to impeach Palori's credibility. Although in its brief the Government does use the term "impeachment" in discussing Diez's contention, this evidence is referred to as "impeachment of Palori's testimony." The context in which the Commission records were

offered leaves no doubt that they were introduced as evidence of guilt.

Palori contends the minutes were introduced to inject an element of political scandal into the trial, because they suggest connivance between him and Prevatt, an unindicted coconspirator and member of the Commission, to arrange for zoning variances and changes. As we explained in our discussion of Diez's motion for severance, however, there were legitimate reasons for the introduction of the minutes. The Government is not required to forego valuable evidence merely because it may lay bare the unsavory details of a defendant's dealings.

■ **905**

To say that the jury might have been confused amounts to nothing more than an unfounded speculation that the jurors disregarded clear instructions of the court in arriving at their verdict.

Opper v. United States, *supra,* 348 U.S. at 95, 75 S.Ct. at 165.[18]

### V. The Government's Use of Charts

■ Palori and Diez claim prejudice by the Government's use of illustrative charts and summaries in connection with the testimony of its summary witness, Agent Brock. Their argument is that the captions on the charts and the headings on various columns of figures misled the jury by assuming the central fact to be proved at trial—to whom various items of income were properly attributable.[19] The caption on one chart, for example, reads "Schedule of Sales, Net Taxable Gains to Peter A. Palori And Amounts Not Reported Or Taxable Gain Reported By Others."

The charts undeniably make assumptions concerning the proper attribution of the income from the transactions in this case, and the propriety of Palori and Diez's attributions of this income was the crucial issue at trial. Any such chart of computations, however, must rest on certain assumptions. Contrary to defendants' argument, the essential requirement is not that the charts be free from reliance on any assumptions, but rather that these assumptions be supported by evidence in the record. United States v. Lawhon, 5 Cir., 1974, 499 F.2d 352, 357; Gordon v. United States, 5 Cir., 1971, 438 F.2d 858, 876; Myers v. United States, 5 Cir., 1966, 356 F.2d 469, 470; Azcona v. United States, 5 Cir., 1958, 257 F.2d 462, 466; Barsky v. United States, 9 Cir., 1964, 339 F.2d 180, 181–182. *See* Watkins v. United States, 1 Cir., 1961, 287 F.2d 932, 934.[20] In this case it is indisputable that the assumptions on which the Government based its charts—that is, its version of the facts—were amply supported by evidence already presented to the jury.

■ The court should instruct the jury that "summaries do not, of themselves, constitute evidence in the case but only purport to summarize the documented and detailed evidence already submitted."[21] Gordon v. United States, *supra,* 438 F.2d at 877. *See* Myers v.

---

**18.** Diez challenges the correctness of the court's cautionary instruction concerning the kind of evidence admissible to connect a defendant with a conspiracy. The record shows that the trial judge apparently did skip a line, inadvertently, when he first read to the jury the standard instruction on this point. No one objected. Moreover, the instruction was correctly repeated throughout the trial, thus eliminating any possibility of prejudice.

**19.** Defendants also object to the parts of one chart listing the total sales price of the properties sold and the listing of the taxable gains, rather than the entire gains, reported by De-Guzman and Minnie Lopez on the various real estate transactions. We find no prejudice from the listing of the sales prices. Furthermore, the taxable gain to Lopez and DeGuzman was only half of the entire gain because they reported these items of income as long-term capital gains. If the entire gain had been shown, the chart would have given a misleading indication of the amount of taxable income Palori had avoided reporting.

**20.** Baines v. United States, 5 Cir., 1970, 426 F.2d 833, relied on by defendants, is inappo-

site. In that case the crucial issue was whether dancing and music occurred simultaneously after 9:30 p. m. in a nightclub, for purposes of a cabaret tax on the sale of liquor. The Government relied on a chart computing the amount of taxes based on the assumption that *every* sale of liquor after 9:30 p. m. occurred while music and dancing were occurring simultaneously. There was no evidence to support that assumption. In this case, each representation made on the charts is supported by evidence in the record.

**21.** Contrary to defendants' assertion, relying on Steele v. United States, 5 Cir., 1955, 222 F.2d 628, this Court has never held that the jury cannot take illustrative charts with them to the jury room. In that case we held only that the charts in question, because of their composition and layout, could not properly have been submitted to the jury, and that it was doubly prejudicial to accede to the jury's request for the charts after the deliberations began. *See* Flemister v. United States, 5 Cir., 1958, 260 F.2d 513, 516; United States v. Warner, 8 Cir., 1970, 428 F.2d 730, 737.

United States, *supra,* 356 F.2d at 470. In this case such instructions were given both when the Government's summary witness testified and again at the close of the case.[22] We believe the court's instructions eliminated any possibility of the charts confusing the jury.

 It is within the trial court's discretion to decide whether the Government may use illustrative charts. United States v. Lawhon, *supra,* 499 F.2d at 357; Gordon v. United States, *supra,* 438 F.2d at 877; Bobsee Corporation v. United States, 5 Cir., 1969, 411 F.2d 231, 241; Lloyd v. United States, 5 Cir., 1955, 226 F.2d 9, 16; United States v. Dana, 7 Cir., 1972, 457 F.2d 205, 207–208. We perceive no abuse of discretion here.

Having reviewed all of defendants' assignments of error carefully, we find no reversible error.

Affirmed.

---

**22.** Defendants contend that the court described these charts in its instruction to the jury as "summaries of facts." Although that phrase appears in the Government's proposed instruction, the record shows that the trial judge did not use this language.